Next in number 2010-5126, HALL v. Department of Health and Human Services. There is a rule when it comes to fee-shifting statutes. That rule is expressed in the AVERA decision. AVERA carved out an exception. AVERA called it a limited exception. In fact, in the AVERA decision, this court cited Davis from the D.C. Circuit and specifically cited the language that said this was going to be a limited exception. However, that was prior to the United States Supreme Court's decision in Richland. In Richland, the Supreme Court overturned this court in carving out a policy exception to that forum rates rule. Now, the government, in its brief, attempts to distinguish Richland from AVERA, saying that Richland dealt with the costs versus the forum rates as opposed to local versus forum rates. Isn't the big difference that the Richland case actually has a statute, and the statute expressly says prevailing market rates, whereas this act has a statute and it says reasonable attorney's fees? Isn't that the key difference between Richland and this case? That's at least what I understand from their government's briefs. No, I don't believe that's a difference at all, Your Honor. This court made it very clear in AVERA that this statute means forum rates, that a federal fee-shifting statute means forum rates. That's the general rule that is the expressed language used by this court in AVERA, that forum rates are the general rule. The heart of the government's argument that was rejected in Richland was that the costs in that case, they were paralegal costs, were substantially lower than what the forum rates were. However, in AVERA, this court... Well, but the reason the Supreme Court held they were entitled to the forum rates was because the statute expressly says prevailing market rates. It's right here in the Supreme Court opinion at page 575. The difference there was whether the paralegal should be considered under the statute like an attorney, but there's no doubt that the Supreme Court clearly relied upon the statute as providing the basis for the forum rates, the prevailing market rate. Well, this court in AVERA relied on subsection 15 of our statute that the general rule, and that's this court's language, the general rule is that forum rates apply. I don't think the difference, however you get to forum rates, we're still at forum rates. That was the ruling in this court. But subject to an exception, and the only way for you to eliminate the exception is to convince us that Richland overturned it or superseded it somehow. Do you want to turn now to the applicability of the exception, or are you continuing to argue that the exception is no longer valid after Richland? All right. I believe that the Supreme Court made it very clear in Richland that carving out policy exceptions because of whatever underlying reason, in that case it was the cost of the paralegal, the underlying cost versus the forum rates, is disfavored. And I think the Supreme Court made it as clear as they could make it. And let me just read the language. This court's language in AVERA dealing with cost versus the windfall argument that the Supreme Court overturned in Richland. This is from page 1348 to 1349, and it's quoted in my brief, page 8. The government contends that the Vaccine Act litigation, a hometown rule, would be more accurate, would more accurately reflect each claimant's actual legal costs and would prevent any particular claimant from receiving a windfall. We disagree. The heart of the government's argument in AVERA that the hometown rule should always apply that was rejected by this court was that the cost of doing litigation or the cost of running a law office is less in some of the hinder lands in this country than it would be in Washington, D.C. And therefore, if you paid forum rates, you would be creating a windfall. That argument was expressly rejected by this court in AVERA. Well, expressly accepted, but for the exception. Right. The exception. Right. That exception was, in fact, the same exception in Richland. You can say you got to it from a different angle. I really think that's a distinction without a particularly large difference myself. But the rule is still that forum rates apply in fee-shifting statutes. Federal fee-shifting statutes, forum rates apply.  The Supreme Court made that clear in the Richland case. And they said to this court, don't carve out policy exceptions because of the cost of paralegals or the cost of running a law office or whatever. It's still don't carve out those exceptions. But I do want to switch gears, Your Honor. And I understand, Your Honor, that that issue is presently before this court in Messiah's case, which you heard. I mean, I understand that that's already being considered. I believe the Supreme Court's decision in Richland was clear. We'll see how this court decides that in this or in the Messiah's case. But I know that's already presented to the court. The next issue is, okay, we have the Stavis exception. This isn't pertinent to this case. But just for completeness of understanding of how the forum rule works, is it a one-way ratchet or does it mean that if somebody from, if a lawyer from New York goes to Jefferson County, Mississippi, to try a case that he gets Jefferson County, Mississippi rates, even if he has a spectacularly good result? Right. That, I find no case law on that issue, Your Honor. My guess is. Lawyers stay out of Jefferson County. My guess is that, I mean, from what the Supreme Court said, you get foreign rates. If it's a fee-shifting statute, you get foreign rates. Okay. Now, oddly enough, the only place where I could give you an example of that is, in fact, in the vaccine program. We have a practitioner who practices in Manhattan that has higher rates. This exception, as I'm sure, I mean, I hope you understand, you need to understand, has swallowed the rule. The general rule is supposed to be foreign rates. The general rule is not foreign rates. Foreign rates don't get paid in this program. There's only one decision I know of in this program where foreign rates got paid and it was the guy from Manhattan because his rates were either the same or higher in Manhattan, so the judge, in fact, really didn't have anything to decide. And so you could say he got foreign rates, but, in fact, he just, you know, he got his local rates. They just happened to be the same. Nobody else has got foreign rates. The exception has swallowed the rule in this program. Well, how about the people that are in this vicinity? Are you saying that they're getting their rates but they don't get foreign rates? No one. There isn't a decision. You notice there's no citation in either brief about foreign rates for anybody because nobody gets them. But, Mr. Gage, how do you bring yourself outside of the exception? Well, I would love this court to give me a definition that allows me to work with that. I mean, I want to know what is a very significant difference. Now, the government complained or pointed out in their brief that I supplied no citations in relation to this. Well, that's because there are none. This is not what we call a very well-developed area of the law. So there are special masters right now that are waiting on this court's decision, in this case, to know what a very significant difference is. And there are fee petitions of mine that are being held up right now waiting for that to be applied, waiting to know what the rule is so they know how to apply it. I don't know. I mean, what is doing the bulk of the work? It's been suggested that if our trials are in Washington, D.C., that that's the most important piece of work that we do for our clients. So maybe that gets me out of the exception, but there's no case law on it. What's a very significant difference? In Avera, my former partner, who argued the Macias case, a judge, in Avera was asking for a 300% increase in his local rates for his foreign rates. And this court said that that is a very significant difference. So is 200% not? I don't know. I don't have anything to cite. Would it make any difference hypothetically if you charge your client x amount at a rate in your office and 2x for litigation held in Washington, D.C.? Does that make a difference? I'm not sure I understand the question. In other words, you charge $100 an hour for work done in Wyoming and $250 an hour for trial work done in Washington, D.C., and that's the agreement that you have with your client. Okay. Does that make a difference in the total outcome of this case? Well, you understand that I can't have those arrangements with my clients. Well, suppose you have that with others. Hypothetically. Oh, well, I'll tell you what I have with other clients. I've been paid and in a fee-shifting statute, but, frankly, in Cheyenne, I get paid $300 an hour. I mean, that's my arrangement. I've got fees at that rate in Cheyenne. I do mostly contingency fee work in Cheyenne. Okay. That's what I do. But I do some hourly work, and I did an asbestos case at $300 an hour. I did an overtime Fair Labor Standards Act case at $300 an hour. That's what I charge in Cheyenne for my Cheyenne rates. This program, however, doesn't recognize that. But I think Judge Kiyosa's question. You can supplement it, but my understanding of Judge Kiyosa's question is that suppose you have a standard $300 if work done in Cheyenne, but if I have to go to Washington, D.C., that it's $450. Okay. Which of those would be the right number for the special master to look at with respect to the question of comparing your rates to Laffey? Well, and I haven't actually brought up Laffey, but I understand the context, Your Honor. I mean, if that's my contractual rate, then I think, well, I think the $450 because that's my contractual rate. However, you know, the Supreme Court doesn't ask that question. That's not what the Supreme Court says. That's not what fee shifting says. I mean, the case law says form rates apply. AVERA says form rates apply. I mean, that's what it says. I'm not sure. The form rates would be Laffey, right? Excuse me? The form rate we're talking about would be the Laffey rate, right? Right. I mean, the claims court judge in this case, in her analysis, said that my rates were, I mean, they mirrored the Laffey matrix, although she didn't cite it. But, sure, I think that's the cleanest and easiest way to do it. But, Judge Garza, I think the answer to your question is no. I don't think that I can independently dictate what my form rates are. I think that's a question that the special masters have to answer or the claims court or this court has to answer. I think Laffey matrix is the easiest way to do it. But just because I have a contract in this statute, the way this statute is set up, it does not allow me to, I mean, I'm prohibited as a matter of law from contracting with my clients for my hourly rate. I mean, that's what it says that. So I don't think that has a bearing on how I do that. So I think the answer to that question is no. No, the statute prohibits you from having a contract with your client. We understand that. But if, in fact, your standard rate would be a certain rate in Wyoming and a certain rate wherever you try a case, whether it's Los Angeles, D.C., or Boston, or New York, should the special master look at your structural rates at that point and say there is a difference between a local rate and a foreign rate? And we'll take that into account. Well, I think, I guess the answer is yes. I mean, they should look at, I'm not sure what difference it makes because I can't dictate what the foreign rate is. But, I mean, they should look at all the evidence. The short answer is, sure, they ought to look at all the evidence. But they ought to be looking at the evidence of what Washington, D.C. lawyers charge, which is established by the Laffey Matrix. I mean, that's what the Laffey Matrix is designed for. This is what foreign rates are for federal fee-shifting statutes. This is a federal fee-shifting statute. This is the form. It seems like the easiest, cleanest, and the least amount of subjectivity has to come into that equation. But that is, obviously, a different question. Different question. I probably shouldn't have even waded into the Laffey question. Yeah. Well, if you have... Okay. We'll reserve a couple of minutes for rebuttal if you need. Okay. Thank you. Ms. Martin? Thank you, Your Honor. May it please the Court. In determining appropriate hourly rates for Mr. Gage, the Special Master correctly applied the binding precedent of Avera. The Special Master's factual findings as to the local and the foreign rate are sound. In the discussion with Mr. Gage, the issue of Laffey rates had been raised. I do think it's important for the Court to recognize that on appeal here, Laffey rates are not the issue. The Special Master determined the local rate to be from a range of $220 to $240 and the foreign rate to be at $350. So that's the range of... Where did the $350 come from? Where did the $350 come from? The Petitioner has an obligation to provide evidence of what the foreign rate should be. And the Special Master in this case considered all the evidence. Here, the Petitioner raised the possibility of Laffey rates, but really didn't develop that very much. It was provided and it wasn't developed to the extent that it was developed in Macias, which was also before the Special Master at the time. And so the parties really relied before the Special Master on his determination in Macias to kind of develop that. Do you have to know what the Laffey rate would be for a lawyer of Mr. Gage's experience? I am not certain. The range that was offered by Mr. Gage initially was between $360 and $410 per hour. I don't think that that necessarily applies to a 2010 rate or a 2011 rate, but I think that that's probably an appropriate range under the Laffey. It's important here that the Special Master found that Laffey was not a relevant consideration in determining the prevailing market forum rates for people doing Vaccine Act cases. And his analysis is very detailed in here, just as it is in Macias. He found that the Laffey case itself has no really relevant similarities in complexity, in skill sets, in the question of what is being considered. Laffey was a novel question of law that involved 3,000 plaintiffs, 13 years of litigation, and a $52 million payout. It involved a lot of lawyers from a lot of different prestigious firms in the area, in the D.C. area. What we have in this case is a single question of whether or not a hepatitis B vaccine caused a shoulder injury. There were experts presented on both sides. There was a hearing that was conducted in Denver, Colorado. There was a decision, there was a period of briefing allowed, and a decision rendered by a Special Master. There was some delay in the case because the case kind of passed through Special Masters, and eventually a decision was reached. So this really has no similarity to what was really at stake or what was at issue in Laffey. So what the Special Master did then in determining forum rates, to get back to your question, was to look at what other available evidence is there. And what he looked at was evidence of other people practicing in the area, in the D.C. area, that are being paid through the program. There he didn't find that the one attorney who practices in D.C., which is Professor Myers, because he is paid through the GW Clinic and it's a nonprofit clinic, was particularly good evidence of the rate. He looked at Mr. Shoemaker's right across the river. That's right. He looked at Mr. Shoemaker in Vienna, Virginia, and he looked at a Mr. Terzian who's practicing also in Richmond. He also looked at cases in the D.C. circuit that did not apply the Laffey rates in D.C. courts, and these were Agapito and Muldrow. Agapito was a case under the IDEIA, and in that case, like here, the trial judge determined that Laffey matrix did not apply because we don't have the same level of complexity that was required in Laffey. And so then he applied, looked there at forum rates. And so it was the rates from Agapito and Muldrow that the special master determined, and he determined a range of rates. Counsel, can I move you to the issues in this case? Because I really don't think these are them. Am I wrong? No, I'm sorry, Your Honor. I was trying to address the court's questions, but I'm – Tell me why 46% to 59% is very significant. I mean, Avera said 300% was very significant, but this case marks a pretty big departure from 300%. That's right, Your Honor. A very important consideration in this case is the standard of review in terms of determining very significant. It is the government's position that the question of very significant is a mixed question of law and fact. And the reason is that you're taking a standard and you're applying historical facts to that and then giving a judgment call to determine whether it's very significant. There is no case law indicating that very significant is a question of law. Now, determined something as a mixed question of law and fact doesn't actually get you to the answer of what standard of review should be applied. And to do that, a very valuable way of looking at it is, who is the better positioned judicial officer to make the determination? Well, if you say mixed question of law or fact, you're saying the ultimate determination of very significant is law, but there are some underlying facts. What would be the underlying facts? Your Honor, I would characterize it actually differently in terms of the mixed question of law and fact. It may be that in mixed questions of law and fact, the ultimate determination is considered a question of law. And I think a good example of that is ineffective assistance of counsel. I mean, that involves various fact-finding along the way, and ultimately, a court can overturn a trial judge's decision as a matter of law. When we're talking here about a percentage being a very significant difference, I think we're more ultimately in the fact range. But here's the problem with that. In the fact range, you want us to then give deference, right? Yes. Suppose two different magistrates both look at a 59% difference and come to the opposite conclusion. That can't possibly be something you want us to affirm. That would be so unreasonable, and it's so objective. It's objective, and it would be so unreasonable to do that. So how could we come to the conclusion when two magistrates, one says 59% is very significant, the other says 59% doesn't seem that significant to me. And then they both come up on appeal to us. I mean, that's the difficulty I'm having with your notion that we should give deference to a determination of what is or is not very significant for a purely quantitative analytical decision. Your Honor, your point is well taken. There is a sort of frustration in the idea that different special masters can determine facts differently. I mean, a forum rate can be determined. That assumes the conclusion that it's a fact. I think the point of Judge Moore's question is why is given the peculiar consequences of saying that 50% in one case is significant and in another case isn't, and we affirm both of them. Why isn't that classifiable as a question of law? Well, I mean, Your Honor, the particular hypothetical you're giving raises that concern. Yes, it does. And why is that not pretty good evidence that the disparity issue is a question of law? Well, I can't say without seeing the reasons that the special master relied on to determine that 59% was a significant difference or not a significant difference. And perhaps there was an arbitrary and capricious nature to that kind of decision. So the underlying way that the special master handles the decision is an important element. The underlying way that he handles it can't inform whether we should give it deference or not. That's a sterile decision. Do we give it deference or not shouldn't ever depend on the underlying manner in which he held it. Either it's something to be reviewed for substantial evidence or something to be reviewed de novo. I mean, that doesn't fluctuate based on how good a job he did writing it up or how many things he looked at. Right. Well, Your Honor, to the extent that the court is looking at this level to make the determination of what is a very significant difference, if you're going to come up with an exact percentage, there is some risk involved in doing that. Now, the first risk is that it would be, in this case, dicta. I mean, there is no identifiable error that the special master committed. When he looked at determining what is a very significant difference, he looked at the cases that were available inside and outside the program. In doing that, there was a range from 46% to 200% in AVERA. When he looked outside the program and with the D.C. Circuit, because the Davis exception comes from the D.C. Circuit, what are they doing? He saw a case. I thought AVERA was 300%. Am I misremembering you? I have a 200% difference, but it very well could have been a 300%. It could have been a 300% difference. It seems like that's a difference that is of some significance. Well, I'd have to get out my calculator. I think the way I find it is 598 over 200. My clerk is saying 300%. I tend to rely on him for things like this. It could be. I mean, I think the formula is 598 over 200 minus 1. It says it's at page 1350, if that helps you. Page 1350. I'm sorry if I misspoke, but you get 46% to 300%. That doesn't necessarily change the calculation. Really? Okay, so if our previous court had held 300% was very significant, you're saying the difference between 300% and 46% and 200% and 46% shouldn't be irrelevant. I'm saying, Your Honor, that the cases when the special master was trying to determine what a very significant difference should be, there was one case at 46%, and then AVERA was at—  It was not one of this court's cases. He was looking at what else was being done at the trial level. So we need to decide. The only thing we have is 300% is very significant. As a matter of law? Yes. It seems as though— We're assuming that we're treating it as a legal question. The only thing we've got is 300% is very significant. We've got to figure out where 46% or 59%, whatever this is, right in between that range falls. Well, Your Honor, if the court is looking here to determine this as a matter of percentage, and I'm not sure, is your question, what would be an appropriate percentage from the government's perspective for a very significant difference? If that's the— Being close with that question, the government would submit that a 20% difference in favor of the form would constitute a very significant difference. In fact, I can provide some concrete numbers for that to explain why that would be the case. If you have a lawyer, a practicing lawyer, who's billing, say, 40 hours per week at 52 weeks a year, and let's say his local rate is $300 per hour, the local rate determined as a factual matter, and that would be factual matters, determined to be $300 an hour. His receivables with that, so 40 times 52 times 300, is $624,000 in attorney's fees. An increase of 20% would raise his rate from $300 to $360. So now we're talking about receivables at the end of the year of a $748,800 difference, or $748,800. So we're looking at a yearly increase, then, of $124,800. That is a very significant increase in receivables at the end of a year. If you were a partner arguing for an increased percentage, you would say, I brought in $124,000 more this year. Are we supposed to be looking at very significant rate, which is hourly, or very significant overall billable amount? Because I read Avera to say very significant rate, which is an hourly difference and isn't what would be the total overall difference between the amount you would collect at 100 hours and the amount this person would collect at 100 hours. Because, sure, you could say, gosh, boy, he was really slow doing this case. He billed 5,000 hours to this one. Right? Well, then, boy, everything's very significant, isn't it? Because even a dollar difference in rate times 5,000 is $5,000. Your Honor, I'm not sure that Avera is – Avera talks about a very significant difference, as does Davis. But difference in rates. And I think rate is the right way to look at it, is the better way to look at it, because it can be kind of – it's not necessarily dependent on a particular hourly rate, but can kind of be cast a little bit wider. If you look at 20%, if you lower those numbers, though, and you look at rates we have here, which is 220 to 264, you're looking at a $91,000 increase over the course of a year. The rate itself, it needs to be kind of given some flesh. It needs to become more concrete. I mean, when you're talking about 300%, 300% was absolutely an easy call. There's no question about it that a 300% difference is a very significant difference, which is why this court concluded that they had no problem. Now, again, I think that it would be helpful if the court had thinking on this area and were to provide that thinking to the litigants, in which case we'd be able to kind of resolve. So you'd like an opinion? We would like an opinion, but an opinion that kind of offered more – Guidance and information on how to calculate. Right. Now, however, in doing that, it is important to recognize that it is dicta, that that would be dicta. And I also think that – Why we have to review, if we get to the question of very significant, if we don't buy into his Richland argument, then we have to review whether or not this amount is very significant. So certainly explaining why it is or isn't wouldn't be dicta. Your Honor, in that regard, I would suggest that the special master here committed no error. And so the court would be affirming 59%. Well, you're assuming that we would affirm. You're right, Your Honor, assuming that – That doesn't necessarily follow. Assuming that the court finds that he committed no error. But, again, to go back, if I can just push the point a little bit on deference, the standardization is very much attractive. But a special master is exposed to cases from what we would consider high-cost areas, from lawyers practicing in high-cost areas like New York and San Francisco and L.A. At the same time, they're exposed to the rates requested by lawyers who are practicing from what we would consider or presume to be lower-cost areas, such as Cheyenne, Wyoming, or Twin Falls, Idaho. The special master is exposed to the constant request for rates. And I also just need to point out that Mr. Gage was incorrect when he said that form rates have never been applied. There was a case in August of 2010 where special master Vowell applied form rates. The case name is – What was the percentage difference? Is Schumann. Well, what special master Vowell did in that case was actually give a range. She said that depending on the year, the range of rates in the form would be 275 to 360, and the range of local rates was 250 to 300. In that case, he was requesting 300. That's, like, less than 10%. I can't give an exact calculation on that because she was kind of – she was using a range. I mean, it wasn't quite a detailed analysis here as to get down to pinpointed numbers. But in this case, though, didn't the special master find that the rate was between 250 and 375? He found that the form rate – That's correct. The general form rate was between 250 and 375. The difference between a 240 that Mr. Gage was asking for and 250 was very minimal. It was $10 an hour. Your Honor, but when the special master was looking at that question, he was including the skill of an attorney. So a 250 rate, and he was saying that Mr. Gage just falls up, you know, in the 350 range. So it was for comparing the 240 to the 260 was not the appropriate. Now, when you look at special master Vala did, she had a 275 to 360 range, which, as I understand, was a range of years rather than ability. I'm confused. Are you talking about our case now, or are you referring to a different case? I'm sorry. I'm referring to the case where the form rate was found. Schuman. Schuman, that's correct. And the requested weight 300 fell within that range, which is different, which is different here than the way the special master, the special master Moran treated it here. He found a pinpointed rate for Mr. Gage. Now, we need also to kind of, to. Based on the pinpointed rate here, I think Judge Garris' question is something I'd really like to hear your answer to. It sounds like there's only a $10 difference. No, because the rate for the form rate for Mr. Gage is $350. It's not in a range. His form rate was $350. And in 2006, his local rate was $220. So we're talking about $130 to 59% difference. And that's a little different analysis than was engaged by special master Vala. The other important point is that, I mean, all of the cases here are not, the idea that you're never getting the form rate. We kind of all win when we can settle and agree on the rate to be applied to an attorney before we get into litigation. So the fact that there are findings that, you know, look at the form rate or the local rate is not really kind of indicative of what's going on down at the ground. And the other thing that's important is the, the findings where form rate and local rate was found in favor of local rate was a number of Mr. Gages. There was his partner in Cheyenne, Wyoming, and they looked at the New York cases as well. So it's not, there's not, I don't think, the impression that Mr. Gage was giving was that there's some sort of systemic problem where special measures are not really considering the form rate. And I don't think that that is a fair assessment of what's going on down at the ground. Thank you, Ms. Martin. Thank you. Mr. Gage, I'll give you a couple of minutes for rebuttal. Your Honors, I guess two things. The fact that we need a rule is just patently obvious. And I have been asked by special masters in status conferences when this is going to come to a head so they will have a rule. I have, myself, fee petitions pending that are suspended waiting for this court to rule on this issue. We need a rule. And when it needs to be a hard and fast rule, here is what a very substantial difference is. I know about. Are there other cases raising analogous questions involving? There's one other that's actually at the federal circuit level now and it's in my statement of related cases. You'll see it in my brief. Yes, that is the case, Your Honor. Mr. Gage, what do you think about the government's argument about quantifying the annual basis? I mean, is that a reasonable way to look at a total aspect of the fee structure? That is utterly unreasonable, Your Honor. Utterly unreasonable. And it shows a lack of any understanding of how law offices run. I mean, I have news for anybody who has some practice in private practice. 30% is about your profit margin. 70% is overhead. They have no idea what numbers they're talking about. The Justice Department doesn't pay their own rent. It's an absurd argument. It's offensive, actually. But the other thing is, and this is just important. I mean, to say that I can get form rates, which is the general rule. It's the rule. It's what's supposed to be applied. But I can only get them if my form rate is $3.40 an hour. The fact is, I'm too good of an attorney. My form rate is $3.50, so I get $2.40. That could be in the textbooks for an absurd result. If the judgment of this court comes out to 70% increase, 60%, whatever you come up with. We need that rule, whatever you come up with. I should be paid the amount of money that gets me to my form rates that doesn't offend the rule. That would actually be a workable system that would allow the general rule to apply instead of always having the exception swallow up the rule, which is what's happening now. I've never been paid form rates. I've had hundreds of cases. Thank you, Your Honor. Thank you. The case is submitted. Thank both counsel.